### THE PEOPLE v. JOEL DIVINE.

Homicide is murder when perpetrated from a premeditated design to effect death, or from a depraved heart, regardless of human life.

What mental disturbance constitutes the insanity which produces an exemption from responsibility for crime.

Defense of property, when the attack upon it is only a trespass, is no excuse for taking life.

What circumstances may be considered in order to ascertain if there be an intention to kill.

THE prisoner was indicted for murder in shooting one Richard Wall.

It appeared on the trial that the prisoner was an educated physician, who had practiced as such for several years in or near Poughkeepsie, until he had accumulated some property, with which he had bought a farm, and then had retired from practice to reside on it. A man by the name of Newcomb owned the adjoining farm, through which the prisoner claimed a right of way out to the main highway. This right of way became a cause of controversy between them, and out of it grew a number of lawsuits, and a great deal of ill-feeling. Newcomb undertook by force to interrupt the way, and from time to time set his hired men to building fences and stone walls, and cutting ditches across it, and threatened to tear down a bridge upon it.

The prisoner was a man of very irascible temper, and became greatly excited at these acts of aggression. He repeatedly threatened to shoot his neighbor and any of his men who attempted to obstruct his passage.

One morning, when he went out from his house to his fields where his men were at work, he discovered the deceased, who was one of Newcomb's laborers, at work at that bridge under-

mining it. He immediately returned to his house, in a state of great excitement, and seized his gun. His wife and his servant, both, remonstrated with him, and asked him if he was going to shoot somebody? He replied he had warned them often enough, and he did not mean to warn them any more. He hurried from his house, and down toward the bridge. On his way he called to Hilliker, one of his workmen, to join him. Hilliker followed him, and when he arrived near the bridge he saw the prisoner raise his gun and fire at the deceased, who immediately fell. The prisoner then returned to his house, saying to Hilliker, as he passed him, "there's another Pine case." He put up his gun and went back to the field where his men were at work.

Hilliker was the only person in sight when the gun was fired, but three other persons were within hearing, and, proceeding to the spot, they found the deceased was shot through the head, and from that wound he died in a few minutes. A *post mortem* examination showed that it was shot, and not ball, with which the gun had been loaded; that the gun must have been so near the deceased that his face and cap were burned with the powder, and that the shot had gone in a downward direction.

On the trial the prisoner did not deny the killing, but then, and in previously giving an account of the transaction, claimed that he had taken down his gun to shoot some crows, and, on approaching the bridge, the deceased had made an attack upon him with an ax, and he had fired in self-defense. At another time he said that the deceased, who was larger and stronger than him, had seized his gun to take it away from him, and in the struggle it had gone off and killed the man.

These allegations, and insanity, were the defenses set up for him on the trial.

The evidence to support the defense of insanity was that he had been wayward and ungovernable from childhood; that he was always very excitable; that about six years before the homicide he had had a fit of sickness, during which he had been insane; and for some time had been in a great state of

excitement about his road, so that he would talk of nothing else.

The other facts in the case appear in the judge's charge.

*Lee (district attorney), and H. Swift,* for the people.

*G. Dean and J. W. Brown,* for the prisoner.

*Edmonds, J.,* charged the jury as follows:

The crime of murder, which is imputed to the prisoner, consists in the killing of a human being without the authority of law, by poison, shooting, stabbing, or any other means, or in any other manner, when perpetrated from a premeditated design to effect the death of the person killed, or of any human being; or when perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any particular individual.

The "premeditated design" contemplated in this definition is not merely malice confined to a particular ill-will to the deceased, but is intended to denote an action flowing from a wicked and corrupt motive, a thing done with an evil intention, attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief, and therefore a premeditated design is implied from any deliberate, cruel act against another, however sudden. This is one aspect of the crime. In the other, where there may be no premeditated design to effect the death of any particular individual, the act itself must be unlawful, attended with probable serious danger, and must be done with a mischievous intent to hurt people. And if it is an unlawful and dangerous act, manifestly so appearing, and it be done deliberately, a mischievous intent will be presumed, for men are presumed to intend the natural and necessary consequences of their conduct.

Such is the general character of the offense which is charged against the prisoner, and the jury are summoned as

witnesses in behalf of the law to certify to the court whether he is justly thus charged.

Three things are to be made out to the satisfaction of the jury, to warrant them in rendering a verdict of guilty on the issue thus submitted to them.

1. The *corpus delicti*, the body of the offense, that is, that a human being has been killed without authority of law.

2. That such killing was perpetrated by the prisoner; and,

3. That it was done by him with a premeditated design to effect death, or by an act imminently dangerous, evincing a depraved mind regardless of human life.

Upon the two first points the jury could have no difficulty. They were clearly established, not only by undisputed, distinct facts, but by the repeated declarations of the prisoner, and the explicit admission on his behalf during the progress of the trial. The remaining point was alone attended with any difficulty. To that the jury would give their careful and serious attention, for on that hung the issue of life and death in the case. This point, embracing the intention or motive of the conceded act of the prisoner, necessarily involved the manner in which it was done, for from that manner the jury were, in some degree, at least, to ascertain the intention.

On the part of the prosecution, it was insisted that there was a premeditated design to effect the death of Wall, or at least that he came to his death by an act of the prisoner, imminently dangerous, evincing a depraved mind, regardless of human life.

On the other hand it is claimed that the death was the result of an accident; that the prisoner was armed with a gun for an innocent purpose, and became engaged in a scuffle with the deceased, in the course of which the gun was unintentionally discharged.

It was for the jury to determine which of these was the true hypothesis, and the judge claimed their attention while he stated to them such considerations as had suggested themselves to him as likely to aid them in arriving at a just conclusion.

This was not, however, the only defense set up for the prisoner. The other was insanity; that is, that at the time of perpetrating the act he was so far bereft of his reason as not to be responsible for his conduct.

Upon this question he should have more to say at a later period. He would now only pause a moment to call their attention to the manifest inconsistency of these two defenses with each other: One involving such a derangement of the intellect as to insure irresponsibility for any act done; the other implying a complete possession of the mental faculties — the power to will a certain line of conduct, and the capacity to understand the nature, quality and consequences, of such conduct.

So, that while one of the defenses called upon the jury to say that at the moment when Wall received the fatal wound, the prisoner was so bereft of his reason as not to know what he was about; the other requires them to declare that, at the same moment, he was fully capable to will that he would go to the house and get his gun to shoot birds; had understanding enough to know how to carry that purpose into effect, and mind and memory enough not only to know all that followed, but to give a rational and consistent account of it immediately afterward.

It must be evident that both these defenses could not be true, and if both could not be true, it was for them to say whether either and which of them was so. If either was well founded, the prisoner cannot justly be convicted. If neither were so, a conviction of his guilt must necessarily follow.

To return, however, to the question whether the admitted killing by the accused was murder? It seems that on the morning of the 25th of May, directly after breakfast, he and his hired men left his house. They went to their work north of the house while he went south toward where the deceased was at work. He soon afterward returned to his house, took his gun and immediately again went down toward the deceased, and agreeable to all accounts approached near to him. In a few moments the report of a gun was heard in that direction,

and the prisoner returned to the house, put up his gun, and went to his work north of the house, where he continued for several hours. Two men who had been at work with the deceased, were at the moment a short distance off, and out of sight of him. On hearing the report of the gun, they hurried to the spot and found him prostrate with a gun-shot wound in the forehead, from which he died in a short time.

These are facts about which there was no dispute, and they necessarily left the question, whether the gun was fired by accident or design, in doubt.

Hilliker, one of the prisoner's hired men, had, however, given testimony which, if true, removed those doubts.

He had testified that when the prisoner came out of his house with the gun, he called to him, and thereupon Hilliker left his work and followed the prisoner down the road toward the deceased, and when within sixty paces of him, he heard the prisoner say, "Richard, I have told you of this long enough;" saw directly afterward the smoke of the gun, heard its report, and saw the deceased fall; that the prisoner turned and came toward him and remarked, "This is a second Pine case. If they won't go according to law, they must suffer the consequences." That Hilliker said to him, "You hav'nt shot one of Newcomb's men?" to which he replied he had, and on being asked which one, he had said, "Richard Wall, I've shot him in the head."

Upon the credit to be given to this testimony, the case mainly relied, and the judge proceeded to submit to the jury the considerations bearing on that point.

In the first place he called their attention to the fact that Hilliker had several times that day, and repeatedly afterward, said, in substance, that he did not see the prisoner fire the gun, did not see the deceased fall, and did not know how he came by his death. These statements, it would readily be perceived, were entirely at war with his testimony on the trial, and necessarily impaired his credit, for the reason that once, at least, he had told a falsehood, and, perhaps, several times. But it did not, therefore, follow that his testimony was cer-

tainly to be discredited. It was for the jury to say which was to be credited, his statements made under the solemnity of an oath, or those made without that solemnity? To determine that question, the jury must look abroad in the case for other facts to corroborate the one story or the other, their duty being to arrive at the very truth of the case.

Hilliker had admitted, in giving his evidence, that he had made those contradictory statements, and he explained them by saying that he did not want to get into trouble about the matter, and many persons were frequently asking him questions about it. It was for the jury to say how far this explanation naturally and rationally explained this inconsistency. In determining this question they must bear in mind that he was an ignorant man, and therefore unconscious how far his presence at the act, without interference to prevent it, might implicate him in its consequences, and that he was a poor man, and therefore liable, if he could not find security for his attendance as a witness, to be imprisoned until the trial.

And, on the other hand, they must not overlook the fact that he had in the first instance been arrested as an accomplice, and had been released from that charge only when he became a witness, lest he might have found in this state of things sufficient inducement to fabricate his present testimony; that it was alleged his sight was defective, and that the public manner in which he stated the offense to have been committed was improbable.

These were the only considerations that tended to impair this witness's testimony. There were several that tended to corroborate it, which must not be overlooked.

Patrick Coffee, the other hired man of the prisoner, also saw him go down toward where Wall was at work; saw him return and go into the house in about fifteen minutes; saw him come out with the gun; heard him call to Hilliker; saw H. follow him down the road; heard the report of the gun; saw both return afterward, and the prisoner go into the house with the gun; and said that Hilliker came to him and told

him that Wall was shot. In all these particulars Hilliker was corroborated by Coffee.

Again, the prisoner's colored servant girl had corroborated him by her evidence, that when the prisoner returned to the house for his gun, he said the damned Irishman had torn up his bridge; that he had told them enough, and he was not going to tell them any more, and that when he went out with his gun he hallooed to his hired man and he went down with him.

The facts then testified to by Hilliker, that the prisoner returned to the house, armed himself, called to H., and went down the road toward the deceased, followed by H., are established by two unimpeached witnesses besides him, and no reasonable doubt is left of the truth of this part at least of his testimony.

There were two expressions which Hilliker's testimony put into the prisoner's mouth, which were deserving of notice. One was, that just before the gun was fired, prisoner had said, "Richard, I told you of this long enough." Such was substantially the remark which the servant girl says the prisoner made to his wife when he came after his gun.

The other one was, that "this was a second Pine case." The fact that Pine had then recently been convicted of murder, for shooting a person in that vicinity, may have caused Hilliker to dwell upon the thought, and weave it into his fabricated story, or the thought may have had its origin in the prisoner's mind. The other testimony in the case showed, however, that it had dwelt in the prisoner's mind, and that he had repeatedly given utterance to it. And it was for the jury to say, under the circumstances, whether the introduction of that expression into the testimony was a truthful statement of what the prisoner actually did say, or was a mere fabrication of the witness. If a fabrication, it was somewhat remarkable, for the other testimony in the case showed that Pine's case had produced in the prisoner's mind the idea of imitating it. The annals of public justice show that that is not uncommon where crimes of special atrocity

have been perpetrated, or have been attended with peculiar excitement. Yet this is a fact not likely to be familiar to an ignorant and unlettered man like Hilliker. Which, then, was the most probable, that the prisoner had actually used the expression, or that Hilliker had invented it to give color to his fabrication? If the former, then Hilliker must have been near enough to hear and see what he now says he heard and saw, the actual commission namely of the crime by the accused.

Again, three witnesses agree in saying that the prisoner called to Hilliker to follow him. For what purpose did he call his hired man off from his work? To see him shoot crows, or to assist him in his designs upon those whom he had warned long enough and would warn no more, and against whom he has since declared he had armed himself?

Another circumstance is to be regarded: Hilliker's testimony places the prisoner in a position where he was capable of committing the crime. The servant girl, the prisoner's other hired man, and Firnam, all unite in establishing the same fact.

Hilliker declared that at the time the gun was fired, the accused was standing near the wall at which the deceased was at work. The evidence of the coroner, and of the examining physician, show that the muzzle of the gun must have been near the head of the deceased. The cap was scorched, the face was burnt with powder, and the shot had scattered very little. Yet not so near as to force the wad into the wound. Were these facts most consistent with Hilliker's story that the prisoner was merely near the deceased, or with the prisoner's, that the deceased shot himself, necessarily having the gun close to his person.

Hilliker says that when Wall was shot, he sank down behind the stone fence, out of his sight, and that he did not see him again. When Wall was found by his fellow laborers, such was his precise position, after having received a wound which the physician says must have instantly deprived him of consciousness and all power of motion.

The People v. Joel Divine.

Hilliker says he heard the groans of the murdered person. The other testimony shows that he did not die immediately, and while he lived groaned frequently.

Hilliker, before the killing, remarked to Coffee that he feared to obey the prisoner's call to him, lest he might get into trouble; and after the event immediately reported to Coffee that prisoner had shot him, going to show, at least, that if Hilliker did fabricate his story, he did so instantly on the happening of the event, and if he did, it may be asked, why did he not adhere to it afterward?

Hilliker declares that he was standing in a position which enabled him to see the deed perpetrated. All the testimony seems to agree that that was possible.

Hilliker says that the prisoner did not go to the relief of the wounded man. Coffee, the hired girl, Mr. Firnam, and Wall's two fellow laborers agree in this, and this fact being well established, gives rise to this important inquiry—why, if the prisoner had shot a man by mere accident, did he not go to ascertain the extent of the injury—to see if he could afford no relief—if he could do nothing to remedy the mischief he had unwittingly caused.

And it is worthy of observation that when the prisoner, soon after his arrest, was told by his counsel, in the presence of Halstead, that he must set up the plea of insanity as his only means of escaping the gallows, the prisoner refused to allow it to be set up, but did not then insist that the deed was accidental. And while this circumstance goes to show that the prisoner did not then intend to rest himself upon the plea of insanity, it gives birth again to the question, why this line of conduct if the act was indeed accidental?

Another consideration was important in that connection, viz.: The inconsistencies which it was alleged were to be found in the account which the prisoner had given of the transaction, it being charged that at one time he had declared it to be accidental, and, at another, that it had occurred in self-defense against an attack made on him by the deceased with an ax. But it must be borne in mind that this charge rested mainly

on the testimony of John Ward, in respect to whom a very respectable gentleman had declared that his character was too much impaired to warrant him in being regarded as a safe witness. On the other hand it must be remembered that J. C. Velie also seems to establish this inconsistency. If the jury were satisfied that it was established, it would be their duty then to apply to these statements the test of consistency, of all others the most unerring test of truth.

Pursuing the search for evidences of corroboration, in which the judge remarked he was engaged, and desired the jury would follow him, he remarked on the testimony of Firman, who, being in an adjoining field, had, on the moment of hearing the report of the gun, seen Hilliker at the spot where he had said he was, had seen the prisoner going north toward him, had seen them meet, had seen Hilliker pass the prisoner, go south, return and follow the prisoner up the road; in all which his evidence agreed with that of Hilliker.

So as to Hilliker's statement of the spot where Wall was at the time he was shot. In that he was confirmed by the testimony of two other witnesses.

The direction which the shot had taken in the wound was also worthy of attention. It was downward from the forehead. Now Hilliker's story would seem to convey the idea that the deceased was bending over a stone wall about a foot high, at work upon it, and the prisoner stood upright, and must have fired downward, and it may well be asked how the shot could have taken that direction, if the gun had been fired accidentally, during a struggle when both parties were standing upright, and, above all, how that could have been the direction of the charge, if the prisoner's account of it to Joshua Velie was the true one?

There was another and a remaining topic of corroboration to which the judge said he should call the attention of the jury, and pass from the subject. And that was the threats which it was alleged the prisoner had indulged in. By Hilliker it was proved that he threatened to shoot McIntosh if he touched the bridge; by Coffee, that he would shoot Newcomb

as soon as he would a rattle-snake; by the hired girl, that he would warn them no more; by Firnam that he would be the death of Newcomb if he molested him in going out; by Mrs. Hilliker, that he would shoot the Irishmen if they touched the bridge, and he did not care for his life; by Ward, that if his gun would not do he had something else that would; by Velie, that he would shoot the damned hounds, and put Newcomb under the bridge; by another Velie, that he would shoot every Irishman that Newcomb had, if they did not leave the road alone; and, by Lake, that he would split Newcomb's brain with an ax.

If the jury were satisfied that these threats had been made by the prisoner, then the inquiry was, what did it show? Not merely that Hilliker's testimony was corroborated so as to be worthy of belief, but that there was a premeditated design to effect the death of some human being; that it had long been contemplated by him, and that the killing imputed to him was but the execution of such design. It was not, however, necessary to establish that the design had been for any length of time premeditated, or even that the prisoner had intended to kill at the time he left his house, or while going down the road. It would be enough for the jury to be satisfied that at the time he presented the gun and pulled the trigger he had such design. For if he had, death having ensued, it would be murder.

These were the circumstances which the jury were to consider in determining the credit to which the chief witness for the prosecution was entitled. But even if Hilliker's testimony were to be entirely set aside, it would not necessarily follow that there should be a verdict of acquittal. It would then be the duty of the jury to consider whether, the direct evidence being out of the case, there were not circumstances enough remaining to enable them to determine the question of guilt? To test this question, the jury were instructed to examine the case, as if there were no direct evidence of the manner in which the gun was discharged, and consider whether, from his prior threats, from his conduct that day up to the moment of

the killing, and his behavior afterward, as testified to by other witnesses, and the admissions made on this trial, they would or would not be justified in the belief that the killing imputed to him by these admissions was from a premeditated design to effect the death of a human being?

If such should be their conclusion, then the question would be whether the other defense, that of insanity, had been made out.

Our statute declares that no act done by a person in a state of insanity can be punished as an offense. Here the question is whether this prisoner was "in a state of insanity" at the time the act was done.

To establish the defense of insanity, it must be clearly proved that, at the time the act was done, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing wrong. If some controlling disease was in truth the acting power within him which he could not resist, or if he had not a sufficient use of his reason to control the passions which prompted the act, he is not responsible. But we must not be misled by a mere impulse of passion, an idle, frantic humor, or unaccountable mode of action, but ascertain whether it is an absolute dispossession of the free and natural agency of the human mind. To constitute a crime a man must have memory and intelligence to know that the act he is about to commit is wrong; to remember and understand that if he commits it, he will be subject to punishment; and reason and will to enable him to compare and choose between the supposed advantage and gratification to be obtained by the criminal act, and the impunity from punishment he will secure by abstaining from it. But if he have not intelligence and capacity enough to have a criminal intent; or if through the overwhelming violence of mental disease, his intellectual power is for the time obliterated, he is not liable as for a criminal act.

In this case the defense was not that the prisoner was gen-

erally insane, but that being of an excitable temperament he had been goaded into madness by the controversy which had grown up in regard to this road, and that he was insane on this particular subject. Now, it was important for the jury to inquire what there was to distinguish this from passion? and whether any delirium had been shown even on this subject? It is true his mind had dwelt much, and his feelings had been very much excited on this subject, but had he labored under any delusion in regard to it? For if he had not, but he had in respect to it shown a rational mind, much disturbed by an excited state of feeling, it was passion and not insanity.

The best test which the jury could apply, would doubtless be to ask themselves whether, up to the instant of the killing, there was evidence of mental alienation enough to justify a magistrate in committing him to a lunatic asylum, or enough to warrant the court in depriving him of the management of his affairs and the control of his property?

To determine that question, several considerations were to be weighed.

On the one side that six years ago, while laboring under a bilious attack, he had shown delirium, which passed off in a few days; that after being confined in the prison some two and a half months he had shown signs of derangement, which might have been feigned, or might have been caused by his situation, but which was of consequence only as tending to show that it might have been so at the time of the killing; that on the morning of the killing he complained of a headache, and that he was full of trouble; that after the deed he said the Almighty had decreed that the road should be opened; that his farm was badly managed, which might have arisen from his ignorance of farming; that some of his maternal ancestors had been similarly afflicted, and that there was no adequate motive for so heinous an offense. In regard to the latter topic the judge said there could scarcely be a more uncertain test. By what standard could that be measured except that in our own breasts, and how could that be a

safe one until our minds were brought to the same state in which accused's mind was?

On the other hand several considerations were to be presented to the jury.

1. The irascible temperament of the accused. He was strong-headed, self-willed, and easily wrought into a passion, and especially, his father says, when he was in trouble or difficulty.

2. He occasionally indulged in the use of ardent spirits, so much so that some of the witnesses supposed his violent conduct to spring from this cause.

3. Three respectable physicians, one of them connected with the jail, and the others who had known him eight or ten years, saw no signs of insanity.

4. Four of his neighbors, respectable persons, who had been intimately acquainted with him eight or ten years, had said the same thing.

5. The clergyman where he lived, a gentleman of intelligence and education, had said the same thing.

6. He had numerous law-suits and tried them himself, even in the Court of Sessions.

7. He had held a public office in his town, and discharged its duties, apparently, with capacity.

8. He had conducted his own business, and managed his own affairs, as a physician and farmer, without exciting in any one the idea that he was laboring under the disease of mental alienation.

From these circumstances the jury were to determine whether, at the time of the killing, the prisoner was insane within the definition of that disease which had already been mentioned to them.

If, however, they should find that the insanity was made out, they should inquire of what kind it was, in order to ascertain whether it was such as afforded an exemption from legal responsibility.

It was not claimed to be general insanity, but monomania, that is a permanent delirium confined to one subject, or a

The People v. Joel Divine.

small number of them, where the sufferers are pursued day and night by the same ideas, and give themselves up to them with profound ardor and devotion, and where they often appear reasonable on subjects out of the sphere of their delirium until some external impression suddenly arouses the diseased train.

Such, it was insisted, was the delirium of the prisoner, that while on other subjects he was reasonable, on that of this road, he was laboring under a delusion. But the question would recur, was there any delusion in fact? Was not every idea entertained by him founded on reality? And was not his conduct the consequence of passion rather than disease?

These were questions for the jury to answer. If they acquitted by reason of insanity, it would be necessary to state this fact, for then if the court should be satisfied that the insanity continued, it would be their duty to confine him in the State lunatic asylum until he recovered, or for life. But if they found a general verdict of acquittal, or if they could not certify that such insanity still continued, it would be the duty of the court to set the prisoner at large.

If, however, the jury should find that neither of the defenses set up for the prisoner were well founded, the remaining question would be, what was the nature of the offense of which the prisoner was to be convicted, murder or manslaughter?

This question arose from the fact, as established by the testimony in this case, that the prisoner had a right to the use of the road which the deceased was engaged in shutting up, and that he was consequently killed while he was engaged in an unlawful act.

Before dwelling upon that topic the judge said he must pause a moment to express the regrets which had been excited in his mind, by the evidence in the case in that regard.

It seems that for more than a year this angry controversy had raged between these neighbors, many law suits had grown out of it, frequent acts of violence had ensued, and much exasperation of feeling, and finally the consummation which had sent one fellow being to an untimely grave, and now

77—vol. 1.

threatened an ignominious death to another, and which had involved two families in abiding distress. All this had arisen from the parties having been permitted to take the law into their own hands, without any interference of the public authorities. It was no wonder that the public peace had been disturbed, and blood had been shed. It might be that he whose unlawful acts had caused the wide spread ruin, had a legal justification for his conduct. That could not be determined in this case, but it was to be hoped he had, as otherwise a fearful responsibility rested on him. But amid their regrets at such an exhibition of lawlessness amid a well ordered community, the court and the jury would draw the salutary admonition so to discharge their duty in the administration of justice that such consequences alone should ensue as the law would warrant and justice demand.

To return, however, to the question on which they were to pass, the judge said it arose under that section of the statute which declares that every person who shall unnecessarily kill another while resisting an attempt by such other person to do an unlawful act, is manslaughter! It would be observed that this provision of the statute had omitted the words "premeditated design," and hence the prisoner's counsel had insisted that the unnecessary killing under such circumstances even though premeditated, was manslaughter only. This was not so; such killing, when voluntary, was murder. It might be lawful to repel even by the death of the offender, a felonious attack on one's property, but where the attack was barely a trespass, the force of the provocation was not sufficient to warrant the use of a dangerous or deadly weapon. An act of violence much beyond the proportion or the provocation was murder, but if the violence was with no instrument or in a manner not likely to kill, it would be manslaughter.

The judge continued, that having now discharged his duty so far as the question of the prisoner's guilt was concerned, he committed the case to the jury with the assurance of his deep felt sympathy with the emotions which they must have in approaching the discharge of their most painful duty. This

was the seventh case of the kind which have been before him since the vacation, and it was impossible to approach them without a thrilling consciousness of their interest and importance. But he felt it to be his duty, and he trusted the jury would alike feel it to be theirs, not to permit their judgments to be driven from their propriety by such considerations, but that in exercising the divine attribute of administering justice among men, while they tempered it with mercy, do that which was very right, leaving the consequences to Him, who alone held them in His hand.

The jury did not agree, and after being kept together over two days were discharged.

A few days before the commencement of the next term of the court, the prisoner committed suicide by cutting his throat.