Sullivan vs. The State.

SULLIVAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 27 — June 23, 1898.*

*Criminal law and practice: Murder: "Intent to kill:" "Premeditated design:" Instructions to jury: Evidence.*

1. An *intent to kill* a person is not necessarily a *premeditated design* to effect his death, within the meaning of secs. 4338, 4339, R. S. 1878, and a homicide, even though intentional, may therefore be murder in the second degree, as defined in sec. 4339. [MARSHALL, J., dissents, but is of the opinion that in this case a premeditated design was not established so conclusively as to render erroneous a verdict of murder in the second degree.]

2. Failure to instruct the jury respecting manslaughter in the second degree as defined by sec. 4351, R. S. 1878, was not a material error in the absence of a specific request for instructions on that point, although the facts were applicable to that degree of homicide.

3. Where the killing grew out of a quarrel in which the accused was charged by the deceased with improper conduct with his wife, the admission of evidence to show such improper conduct was not error.

ERROR to review a judgment of the circuit court for Vernon county: O. B. WYMAN, Circuit Judge. *Affirmed.*

For the plaintiff in error there was a brief by *Smith & Griffin* and *Morrow & Masters,* and oral argument by *J. M. Morrow* and *C. J. Smith.*

For the defendant in error there was a brief by the *Attorney General* and *John L. Erdall*, first assistant attorney general, and oral argument by *Mr. Erdall*.

CASSODAY, C. J.   The plaintiff in error was convicted of murder in the second degree, for having killed Asa Gorham, January 25, 1897.   He was charged with murder in the first degree.   The defense was justifiable homicide.

There is evidence tending to prove that Gorham and *Sullivan* were neighbors and lived some twenty-four rods apart; that a difficulty had arisen between them by reason of the alleged improper relations existing between Gorham's wife and *Sullivan*, who was an unmarried man, living alone in a house; that ten days previously Gorham had abandoned his wife, and was living in a house a short distance away; that on the day in question he was passing *Sullivan's* house on his way to his own house, where his wife was still living; that *Sullivan* was sawing wood at his own house; that as Gorham came up to him he charged *Sullivan* with improper conduct with his wife, and a quarrel resulted; that Gorham picked up a stick of wood, and *Sullivan* drew a revolver, and a fierce struggle ensued; that Gorham finally succeeded in taking the revolver away from *Sullivan* after he (*Sullivan*) had made several attempts to shoot him, and a bullet fired from the revolver having grazed Gorham's neck; that Gorham (who was the larger man) threw *Sullivan* down, and gave him a very severe beating, so that the left side of his head and face was severely bruised, his left eye was so swollen as to be closed, and there was a cut across his face, and his nose and mouth were badly swollen, and his nose was bleeding freely; that a number of wounds on his face were of a circular character, as if made with the butt end of a revolver; that *Sullivan* finally succeeded in getting away from Gorham and immediately ran into his own house, seized a rifle hanging there upon the wall, and then ran out again; that

Gorham meanwhile had started for his home, where his wife was, and had reached a point 175 feet distant from the little woodpile near *Sullivan's* house where the struggle had occurred; that, as *Sullivan* came out of his house, he saw Gorham standing in the road, apparently waving the revolver, and pointing it in the direction of *Sullivan*, and that he immediately shot at Gorham.   There was some conflict in the testimony as to whether *Sullivan* fired off his rifle immediately after he stepped out of his own house, or whether he ran some ninety feet from his house in the direction of Gorham before doing so.   The preponderance of testimony tends to show that the shot was fired immediately after *Sullivan* came out of the house.

It also appears that the whole transaction only consumed a very few minutes; that *Sullivan* claimed that, immediately after firing the shot from his rifle, he went back into his own home, not realizing at the time that he had hit Gorham; that Gorham received a mortal wound, from which he died within a few hours; that the only witnesses to the transaction were the parties concerned and Gorham's wife; that she saw the most of the struggle between the two men, but her attention was diverted, so that she was not looking at the two men at the time of the shooting, but heard the shot which resulted in the death of her husband.

Gorham's dying declarations were to the effect that he was coming by *Sullivan's* with a pail of water for his colt; that *Sullivan* was sawing wood at his woodyard; that he stopped, and told him he wanted him to keep off his premises and let his wife alone; that *Sullivan* then struck at him, and struck him in the mouth, and he clinched him; that when he clinched him *Sullivan* drew a revolver and tried to shoot him; that he caught the revolver, and raised it enough so that the shot went over the back of his neck; that he took the revolver away from *Sullivan*, and started home; that he got about halfway home when *Sullivan* ran out with his rifle and shot him.

Sullivan vs. The State.

It further appears from the evidence, in effect, that at the inquest *Sullivan* admitted that he aimed about midway of Gorham, and shot to kill; that at the trial he was unwilling to admit that he had ever said he aimed at any particular portion of Gorham's body, but did admit that he said at the inquest he "shot to kill;" that the character of the wounds indicated that Gorham must have been facing, or partially facing, *Sullivan* when the fatal shot was fired.

Gorham's widow testified, in addition to what is stated, to the effect that she saw Gorham at the woodpile with a stick of wood raised as if to strike *Sullivan*, who was apparently backing up and pulling off his mittens, and heard him say, "I will kill you," and that, as she was picking up her little girl, they both went to the ground; that they got up, and clinched again, and both fell; that she heard one shot from the revolver while they were down on the ground; that when *Sullivan* came out of the house, and was on the steps with his gun, Gorham was near *Sullivan's* chicken coop; that she then started to go outdoors, and while going out, heard the gun go off; that when she looked again Gorham had just gotten up.

*Sullivan*, among other things, testified to the effect that he was thirty-two years of age; that he had lived in the neighborhood ten years, and knew Gorham during that time; that up to two or three months before Gorham's death the relations between them had always been friendly; that just before Christmas Gorham's wife told him that Gorham was going to shoot him, that he was jealous of him; that he noticed that Gorham did not speak to him when he passed him; that he had been warned to look out for him; that consequently, and just before Christmas, he had procured the revolver, so that, if Gorham jumped on him or tried to shoot him, he would have something to defend himself with; that when Gorham came by his woodpile he said to him, "*Sullivan*, one or the other of us has got to die; my life is not worth anything to me;" that he then grabbed up a

stick of wood, and said, "You God damned Irish son of a bitch," and started for him; that he then told Gorham not to strike him with the stick of wood; that he kept backing up towards his house, and tried to get his mittens off; that when he got them off he threw his hands up to ward off the blow, and pulled out his revolver; that Gorham then got him down, and struck him with a stick of wood; that he struck him before he got the revolver, several times; that he thought the revolver was fired while in his hand; that he was so excited that he did not know how he got away from Gorham; that when he first opened the door, coming out with the gun, Gorham was standing near, waving his revolver; that he jumped off the steps, and it looked to him as if Gorham had the revolver pointed right at him, and then he shot; that when he came out of the house with the gun, he did not stop at all anywhere before he fired the gun; that he did not take more than one or two steps anyway; that when he fired it looked to him as if Gorham was about facing him; that the gun hung by the side of the house, and was loaded; that it had three or four different shots in it, and one blank cartridge.

There was much in the testimony as to the relations between Gorham and *Sullivan,* and between *Sullivan* and Gorham's wife, and also that Gorham was a violent, quarrelsome, noisy person; that he had made threats against *Sullivan;* and that *Sullivan* was prepared to resist any attack made upon him by Gorham.

It is contended that the verdict of murder in the second degree is not sustained by the evidence; that, under the evidence, the jury were bound to find either that *Sullivan* was guilty of murder in the first degree, or to acquit him on the ground of excusable or justifiable homicide. Accordingly, error is assigned because the court, among other things, charged the jury that "the killing of a human being, without authority of law, by shooting or otherwise, when perpetrated by an act imminently dangerous to others, and

evincing a depraved mind, regardless of human life, without any premeditated *design* to effect the death of the person killed, is murder in the second degree. . . . If you believe from the evidence beyond a reasonable doubt that the defendant, without justifiable cause or legal excuse, as explained in these instructions, killed the deceased; that such killing was perpetrated by an act imminently dangerous to others, and evinced a depraved mind, regardless of human life, *without any premeditated design* on the part of the defendant to effect the death of Asa Gorham,— then the defendant is guilty of murder in the second degree; and if you so find and believe from all the evidence in the case, beyond a reasonable doubt, your verdict should be guilty of murder in the second degree." This contention is based upon the theory that an intent to kill Gorham was equivalent to a "premeditated design to effect the death of the person killed," and hence was murder in the first degree. R. S. 1878, sec. 4338. But the court also charged the jury that "the homicide or killing of a person is justifiable when resisting any attempt to murder such person, or to commit any felony upon him, or when committed in the lawful defense of such person, when there shall be reasonable ground to apprehend a design to commit a felony or to do him some great personal injury, and there shall be reasonable cause for believing that there is imminent danger of such design being accomplished. . . . There can be no legal justification for taking life under the claim of self-defense, unless the necessity for taking life appears to the accused to be present and urgent; that is, unless it appears to the accused that the taking of his adversary's life is the only reasonable resort of the party to save his own life or to protect himself from great personal injury." Counsel take no exception to these portions of the charge, and they seem to be justified by the statute. R. S. 1878, secs. 4366, 4367; *Richards v. State*, 82 Wis. 172.

The intent to kill, which is present in the case of excus-

Sullivan vs. The State.

able or justifiable homicide, must be something different from the "premeditated design to effect the death of the person killed." Since this is so, may there not be an intent to kill when "such killing is perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, *without any premeditated design* to effect the death of the person killed, or of any human being"? R. S. 1878, sec. 4339. This court has recently answered this question in the affirmative. *Flynn v. State*, 97 Wis. 44; *Terrill v. State*, 95 Wis. 276. In the first of these cases a verdict of murder in the second degree was sustained upon facts quite similar to the facts in the case at bar. In that case the late Mr. Justice NEWMAN, speaking for the whole court, said: "If the evidence left it fairly in doubt, then it was a question for the jury, and its verdict is conclusive upon it. The circumstances of the homicide, as shown by the evidence, do not so certainly indicate premeditated design as that it would not still be possible fairly to question its existence in the mind of the plaintiff in error. It seems that the evidence in that respect would support either of two propositions,— either that the homicide was prompted by a premeditated design to effect the death of Sullivan, or that it was the reckless act of an angry man, evincing a depraved mind, regardless of human life, yet not prompted by that settled purpose to effect the death which constitutes the premeditated design to effect the death, of the statute." See, also, *Clifford v. State*, 58 Wis. 491; *Giskie v. State*, 71 Wis. 612; *Odette v. State*, 90 Wis. 258; *Frank v. State*, 94 Wis. 211. We must hold that there is no error in the portions of the charge quoted, and that the verdict is supported by the evidence.

Error is assigned because the court charged the jury on the subject of manslaughter in the second degree in the language of sec. 4350, R. S. 1878, but failed to charge the jury as to manslaughter in the second degree, as defined in

sec. 4351, R. S. 1878.  It is enough to say that, even if such additional charge had been applicable to the facts, yet, as there was no request to so charge, it was not reversible error.  *Manning v. State,* 79 Wis. 178; *Zoldoske v. State,* 82 Wis. 581; *Odette v. State,* 90 Wis. 259.

It is said that the court .erred in permitting the jury to take to their room the written charge.  But we find nothing in the record showing that the charge was taken to the jury room; much less any portion of the charge which would have been prejudicial to the accused.

We perceive no error in permitting testimony in respect to improper relations of *Sullivan* with Gorham's wife.

We find no reversible error in the record.

*By the Court.*— The judgment of the circuit court is affirmed.

MARSHALL, J.  I again dissent from the doctrine that there can be a distinct intent to kill under circumstances rendering the slayer guilty of felonious homicide, without the element of " premeditated design " essential to murder in the first degree.  In the dissenting opinion in *Terrill v. State,* 95 Wis. 276, I so fully discussed the subject that it is hardly necessary to do more here than to refer to what was said there.  The danger which was there apprehended, that it would subsequently be claimed from the decision of the court that there may be a distinct intent to kill and an absence of the premeditated design of murder in the first degree, and all the facts, nevertheless, exist, requisite to murder in the second degree, or manslaughter in the first, second, or third degree, is fully exemplified by the decision in this case.  There was some reason, it was supposed, in the *Terrill Case,* for the holding of the court there, because the words " without premeditated design to effect death " do not occur in the statute as to the branch of manslaughter there under consideration; but as it was then apprehended

by the writer, the reasoning of the case indulged in has been here applied to the degrees of felonious homicide containing such words.

It should be said in passing that the reason which the writer thought possibly existed, as before stated, for the decision in the *Terrill Case*, because the words "without premeditated design to effect death" did not occur in the statutory description of the offense of manslaughter there being considered, is no longer apparent, having been effectually removed by a more careful study of the subject. Such investigation and study also relieves the learned chief justice who wrote the opinion in *Hogan v. State*, 36 Wis. 226, from the suspicion expressed in both opinions in the *Terrill Case*, that in what he said he overlooked the fact that in one grade of manslaughter in the second degree, under our statute, premeditated design is not included. His familiarity with the New York statutes, which were substantially like ours, and his knowledge that such statutes had been construed in that state and the term "intent to kill" held to be synonymous with "premeditated design to kill," and that such intent or design cannot exist in manslaughter in the second degree, either under that branch using the words "premeditated design" or the branch omitting them, led him naturally to say what he did, making no reference to the fact that such words are omitted in our statute in regard to unnecessary killing. He undoubtedly also had clearly in mind *State v. Fee*, 19 Wis. 562, and endeavored to make a plain statement of the law, clearing up anything there said in conflict with the rule elsewhere under similar statutes. In *People v. Divine*, reported in 1 Edm. Sel. Cas. 594, where the New York statute was under consideration, the instruction to the jury, given by the trial judge, was approved, to the effect that the section of the statute declaring that every person who shall unnecessarily kill another while resisting an attempt by such other person to do an unlawful

act is guilty of manslaughter, though omitting the words "premeditated design," cannot be so construed that the unnecessary killing under such circumstances, even though premeditated, is manslaughter only; that such killing, when voluntary, is murder; that while it may be lawful to repel, even by death of the offender, a felonious attack on one's property, where the attack is purely a trespass the force of the provocation is not sufficient to warrant the use of a dangerous or deadly weapon; an act of violence much beyond the proportion of the provocation is murder, but if the violence is without any instrument, or in a manner not likely to kill, it is manslaughter.

It is now squarely held that there may be a distinct intent to kill, and yet there be no premeditated design to effect death. In my judgment that is an unreasonable and dangerous doctrine, and contrary to the law as long held by this court, and contrary to substantially all reputable authority on the question. Said RYAN, C. J., in *Hogan v. State*, 36 Wis. 226: "Previously formed intent to kill, and premeditated design to effect death, are synonymous terms;" and again: "We take the premeditated design of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation." Said Mr. Justice EDMONDS, in *People v. Austin*, 1 Parker, Cr. R. 166: "Whether an act be murder or manslaughter under our statute, depends entirely upon the existence of an intent to kill. . . . There is only one homicide known to our law which becomes murder in the absence of an intent to effect death, and that is when the act is perpetrated by one then engaged in the commission of a felony. Except in that one case no homicide is murder without an intention to kill, and with such intention every homicide, with the single exception mentioned, unless it be justifiable, is murder. . . . If a homicide be perpetrated, but without an intention to kill, it would be manslaughter and no more, except as stated;

but if perpetrated with an intention to kill, no matter how recent the provocation or how high the passion, it is murder. . . . The intention to kill being established, there is no degree or description of manslaughter in the statute which can embrace it." In considering the above observations by the New York court, it must be kept in mind that they are speaking of statutes identical with ours. We may further refer to *People v. Sullivan* and *People v. Clark*, in the court of appeals, reported in 2 Edm. Sel. Cas. 294, 7 N. Y. 385,. 396, where Mr. Justice JOHNSON, who delivered the opinion of the court, said: "The question here is — an intention to kill existing at the instant of striking the fatal blow, is such an intention a premeditated design within the meaning of the statute? The words 'premeditated,' 'aforethought,' and 'prepense,' possess etymologically the same meaning. They are the Latin and Saxon synonyms, expressing a single idea, and may possess in law precisely the same force. The statute has not altered the law." 'An intention to kill, existing at the instant of striking the fatal blow, is a premeditated design within the meaning of the statute.' Many other authorities to the same effect are cited in the *Terrill Case* by the writer, which the reader is referred to for further light on the subject. Intentional killing, not excusable or justifiable, I hold to be murder in the first degree, and that, as said by Mr. Justice JOHNSON in the New York case, the law in that regard cannot be relaxed without substantially diminishing the security of human life.

While dissenting from the opinion of the court here, as observed above, I concur with the decision as rightly made upon the doctrine of *Flynn v. State*, 97 Wis. 44, and cases there cited, but I find no language in that case warranting a citation of it to support the doctrine that there is a distinction between the terms "intent to kill" and "premeditated design to kill."