MONTGOMERY, Plaintiff in error, vs. THE STATE, Defendant in error.

*May 15—June 5, 1908.*

*Criminal law: Homicide: Withdrawal of lesser degrees from jury: Acquittal: Conviction of higher degree: Reversal: Jeopardy: Premeditation and heat of passion: Evidence: Confidential communications: Husband and wife.*

1. On the first trial under an information charging murder in the first degree the court withdrew from the consideration of the jury all lesser degrees of homicide, holding that there was no evidence warranting the submission of any of them. Defendant was convicted, but on writ of error the judgment was reversed and it was held that the evidence did not warrant the conviction of murder in the first degree and that certain degrees of manslaughter should have been submitted to the jury. *Held*, that there had been no acquittal as to any of the degrees of homicide, nor had the accused been in jeopardy so as to preclude his conviction, on a second trial, of any degree of murder or manslaughter—all of which are included in the charge of murder in the first degree.

2. Premeditated design and heat of passion are not necessarily inconsistent terms when used with reference to a homicide.

[3. Whether, upon the trial of a husband charged with premeditated murder of his wife, letters written by her to him shortly before the homicide, when offered in evidence on his behalf to show the absence of ill-feeling between them, were properly excluded as being confidential communications, is not determined.]

4. The state of feeling which such letters tended to prove being abundantly proven by parol testimony, and the jury having found that the killing was not premeditated but was done in the heat of passion, so that defendant was guilty of manslaughter in the second degree only, the error, if any, in the exclusion of the letters was not prejudicial.

5. A letter written by the deceased to the defendant prior to their marriage three years before the homicide, was properly excluded as too remote.

6. The evidence in this case is *held* to sustain a conviction of manslaughter in the second degree.

ERROR to review a judgment of the circuit court for Jackson county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

The plaintiff in error, who will be hereinafter referred to as the defendant, was from 1900 to 1903 a farmer, living about seven miles east of the village of Warrens, in Monroe county.     He was forty-one years old at the time of his wife's death, May 30, 1903.     He had been a widower for some years prior to his marriage to the deceased in 1900, living on a small farm with his children.     The deceased's maiden name was Blanche Howard.     Prior to her marriage the deceased had taught school in the district where he lived and elsewhere, and thereafter continued her vocation for a considerable part of the time.     She was about twenty-five years old at the time of her marriage.     Her weight was 130 pounds.     Defendant weighed over 200 pounds, was rather high tempered, and years before he had been convicted of personal assault upon another, and was somewhat addicted to the use of intoxicating liquor.     The deceased taught school at Stowell, some distance from her home, in Monroe county, in April and May, 1903, and during that time visited her husband every two weeks and he visited her about as often, and letters were written by each to the other, at least three by the deceased and two by the defendant.

On May 29, 1903, defendant drove with his team and buggy to Warrens and took the train to Stowell and spent the night with his wife at Mr. Belcher's, where she was boarding.     During the night Mr. and Mrs. Belcher heard angry talk and crying in the bedroom occupied by the defendant and the deceased, and the next morning she showed plainly that she had been weeping.     The defendant and his wife took the morning train for Warrens, where they spent the day attending the exercises of Decoration Day.     They both drank beer and whisky with their friends, but neither became intoxicated, and near 6 o'clock in the afternoon started for home.     The team, one rather a slow horse and a colt, were hitched to a single-seated, side-spring road wagon, with a high back seat.     The right-hand spring being weak,

the deceased rode on that side. They both then appeared to be in usual health and spirits and to feel friendly towards each other.

The defendant states that soon after leaving town the deceased complained of feeling faint and asked for the whisky bottle; that he had a pint flask, one third to one half full, from which she then drank and from which she later took another drink, and that he drank what was left and threw the bottle away; that a few minutes thereafter she caught him about the neck, saying she had been wicked, and told him about her improper relations with a man at Stowell. Defendant says that he did not believe her statements, but he took an envelope out of his pocket which contained a confession which she had previously made of other similar conduct, and threatened to send it to her father if she did not stop telling lies, quit teaching school, and stay at home where she ought to be; that she asked him to destroy the paper, but he refused; that she then tried to grab it, and when she could not she clutched right into his face; that he caught hold of her and held her until she stopped struggling; that after going about ten rods, as the horses were walking, she got out of the buggy, and that he got out and helped her in; that she acted kind of dazed, and he thought she had taken too large a drink of whisky; that he was not angry when his wife made the confession of wrongdoing; that similar confessions were made at times when they were at home, and had been overheard by his daughter Nina.

Defendant states that after his wife returned to the buggy she looked faint and he put his arm round her and she leaned up against him, and they drove along in that way for nearly two miles; that then she sat up and he took the whip to start the horses, and as he returned the whip to the socket she pitched forward and he thought her face struck the "ex" of the buggy near the hub; that she fell onto the ground and that the buggy ran over her; that he stopped the team as

quick as he could, jumped out, and went back and picked her up; that then she had bruises on her nose and lips; that when he led her back to the buggy she commenced to turn round, tried to get away, and "hollered," frightening the team so that he had to run and catch them and tie them to a telephone post; that his wife started back towards Warrens, and that as soon as he got the horses tied he ran and caught her and brought her back to the buggy; that he started to untie the horses, and his wife started towards Warrens and he had to go after her; that when he caught her she pulled away from him and threw herself on the ground; that he helped her up, talked with her a few minutes, and then got her back into the buggy again. He was here seen by an acquaintance, Roy Lamb, who was ten or fifteen rods distant to the west, approaching on the same road. Defendant says he untied his team, got into the buggy and put his arm around his wife, and started the team for home at a fast pace—one horse was running and the other trotting; that he knew there was something wrong and that his wife had hurt herself, and he thought the best thing to do was to get her home. It may here be noted that Mr. Lamb was accompanied by his sister and they might have given assistance if any was needed, but the defendant did not wait their approach. They turned off upon another road a short distance from this point.

Defendant states that after the deceased got into the buggy at this time she sat leaning towards him, with her head against him on the right side, and that he had his arm round her waist; that they proceeded in this manner until within about three quarters of a mile from home, near the Greens' residence, when she raised up and said that she felt all right; that he reached for the whip with his right hand to start up the team, and as he did so his wife fell out of the buggy between the wheels; that he grabbed for her with his right hand; that his hold broke loose and he then grabbed her by the leg; that he hung to her for a moment, and that she finally fell

onto the ground; that she was dragged some distance by rea-
son of his holding to her and the horses running; that he
stopped the horses as soon as he could, ran and got his wife,
carried her in his arms, and lifted her into the buggy on the
left-hand side, holding his wife with her face on his breast.
The defendant was here seen by Pearl Green and her brother,
Tom Green. Defendant did not stop at this house for as-
sistance, but drove rapidly by to his own home. Tom
Green went to the spot where the deceased fell out of the
buggy the last time and found that the body had been dragged
some fifty-three paces along the highway while, as the de-
fendant says, he was holding onto her leg.

Defendant says he drove fast until he reached home and
that his wife was unconscious during that time; that when
he got home his daughter Nina came out and they helped
the deceased out of the buggy and into the house; that Nina
said she could not wash her mother, and that she took care of
the team while he bathed his wife's face; that he found one
eye was swelled shut and her face was badly bruised; that he
laid her on the bed and went to the telephone and called
Dr. Sidell at Warrens; that his wife roused up, and after
Nina came in she called her by name and wanted to be helped
off the bed and out of the bedroom to the waterpail; that the
deceased stood on her feet without help; that they gave her a
drink of water, and she sat down in the chair and asked Nina
if she was home and spoke of a little colt which she wanted
to see; that defendant told Nina to go and drive· the colt
from the pasture; that Nina started out, and had gone a
short distance when she heard the deceased call her name
three times. Defendant and Nina both say that he followed
her out of the door out of sight of the deceased, and that
Nina followed her father inside, although he entered the
house a trifle in advance of her. Nina says that the deceased
was seated in a chair, unconscious, with her head leaning
back against the wall, and that the defendant then said: "My

God, Nina, I believe Blanche is dead." Defendant testified that when he entered the room in advance of Nina his wife was upon the floor and that he lifted her up and placed her in a chair. Defendant and his daughter carried the deceased out in the front yard, where she could get fresh air, and where she immediately thereafter expired, according to their testimony.

The facts are fully stated in the report of this case upon the first appeal (128 Wis. 183, 107 N. W. 14) and this brief summary is given of the statements of the defendant for a better understanding of the issues here presented. This court held that the evidence given upon the first trial was not sufficient to sustain a conviction of murder in the first degree and that the trial court erred in not submitting to the jury the question as to whether the killing was not done in the heat of passion, so as to reduce the crime to manslaughter in the second or fourth degree. The action was remanded for a new trial, and defendant was tried on the same information and on substantially the same evidence and convicted of manslaughter in the second degree.

The action was brought to trial in Jackson county after a change of venue, and a motion was then made on behalf of the defendant that the indictment be quashed for the reason that the record showed the acquittal of the defendant of every crime included in the present information. The same question was presented by a plea in bar and also by a plea in abatement based on the record of the former trial. A demurrer to these pleas was sustained. At the close of the trial the defendant moved for a direction of verdict of not guilty and for the acquittal and discharge of the accused based upon the records and evidence. This motion was denied and the cause submitted to the jury with the result already stated. A motion to set side the verdict and for a new trial was denied and the defendant was sentenced to the state prison for seven years. The case is before the court for review upon writ of error.

For the plaintiff in error there was a brief by *A. H. Smith,* attorney, and *G. M. Perry* and *F. J. Smith,* of counsel, and oral argument by *Mr. Perry* and *Mr. A. H. Smith.*

For the defendant in error there was a brief by the *Attorney General, A. C. Titus,* first assistant attorney general, and *Wm. B. Naylor, Jr.,* district attorney of Monroe county, of counsel, and oral argument by *Mr. Titus, Mr. Naylor,* and *Mr. R. B. Graves.*

BASHFORD, J.   The motions and pleas interposed on behalf of the defendant challenging the sufficiency of the information and urging former jeopardy are fully met by the decision of this court on the first appeal.   It was there held that the evidence adduced did not justify a verdict of premeditated murder, and that there was error in refusing to give the instruction requested on behalf of the defendant that the jury might find from the evidence that the defendant was guilty of manslaughter in the second or fourth degree.   It was there held that upon this information and upon substantially the same evidence the jury might have found that the killing was done in heat of passion and not from premeditated design, although the defendant had testified that he was not made angry by the alleged confessions of the deceased.   The action was remanded for a new trial upon the same information and upon such evidence as might be brought forward to establish the guilt of the defendant and the degree of homicide if he should be again convicted. The trial court followed the rules of law laid down in that decision and the jury found the defendant guilty of manslaughter in the second degree.   The particular objections raised to this judgment may therefore be regarded as *res adjudicata* and cannot, therefore, require extended consideration.   It is urged that the trial court, by withdrawing from the jury on the first trial all offenses other than murder in the first degree, acquitted the defendant of such charges. This was simply an erroneous instruction given by the court,

and the defendant was not placed in jeopardy as to the minor offenses that were withdrawn from and which were not considered by the jury. *Hoffman v. State,* 97 Wis. 571, 73 N. W. 51; *Perkins v. State,* 78 Wis. 551, 47 N. W. 827.

The contention is made on behalf of the defendant that the jury on the first trial, by its verdict of murder in the first degree, which involves a premeditated design, in effect acquitted the defendant of any offense in which heat of passion is an essential element, as in manslaughter; that premeditated design and heat of passion are inconsistent terms and cannot both exist at the same time. The last statement may be true in the abstract with respect to a mental state, but it cannot be applied as a rule of evidence. There may be a premeditated design to kill. There may be sudden provocation, and in the heat of passion the crime may be committed, and it is then for the jury to determine from the testimony the degree of homicide. This was the state of the record in *State v. Johnson,* 1 Ired. Law (23 N. C.) 354, 35 Am. Dec. 742, the leading case cited by defendant's counsel. The court there sustained a verdict of murder, although it is clear from the opinion that a conviction of a less offense would have been approved. Under such circumstances one jury might believe that the offense was committed upon a premeditated design, and a second jury might believe from the same evidence that the crime was the result of sudden provocation and committed in the heat of passion. The authorities do not sustain the defendant's contention that the conviction of murder necessarily negatives an element of the lower offense of manslaughter. The statements found in text-writers and adjudicated cases referred to by counsel with respect to former jeopardy can have but slight application under the statutes and decisions of this state. The words "premeditated design," found in sec. 4338, Stats. (1898), defining murder in the first degree, signify merely an intent to kill. Sudden intent is not excluded. *Hogan v. State,* 36 Wis. 226; *Cupps*

*v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546. In *Hogan v. State* Chief Justice RYAN enters into an able and exhaustive discussion of the common and statute law upon the subject, and places a construction upon this statute which now has the full approval of the court. He says (p. 244):

"We take the 'premeditated design' of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent, and need not be slow or last long. This very plainly appears, not only by the force of the words used, but also by the apparent use, throughout the definitions of murder and manslaughter, of the terms 'design' and 'premeditated design' to effect death as co-equal terms."

Applying the language to the instant case, the jury on the first trial must have been convinced that the defendant had previously, or upon provocation arising at the time, formed a design to kill his wife. If the evidence justified this conclusion he was guilty of murder in the first degree. The jury on the second trial must have found that there was no design to effect death, but that in the heat of passion arising from the quarrel he killed his wife in a cruel and unusual manner, which supports the conviction of manslaughter in the second degree. This view is further supported by the discussion of the subject found in the two opinions of Mr. Justice MARSHALL in *Cupps v. State,* 120 Wis. 504, 97 N. W. 210, 98 N. W. 546.

It is also contended that the decision of this court on the first appeal, that the evidence was not sufficient to sustain the verdict, acquitted the defendant of murder in the first degree. That rule was early discarded in this state. *In re Keenan,* 7 Wis. 695; *Benedict v. State,* 14 Wis. 423. This court in *State v. Parish,* 43 Wis. 395, in discussing the effect of a motion for a new trial, says (p. 401):

"When a verdict of guilty in a criminal case is set aside, all the proceedings on the trial are necessarily set aside and vacated with the verdict. So when the verdict is set aside

on motion of the accused, and he afterwards alleges that the trial and verdict put him in jeopardy of punishment, it may well be replied that the portions of the record by which alone the jeopardy can be proved have been set aside and vacated at his request, and that he has thereby deprived himself of the means of proving his allegation of jeopardy."

That rule, which is subject to the qualification indicated in the case cited below, applies to the objection urged as to the legality of the last conviction.  *Birker v. State,* 118 Wis. 108, 94 N. W. 643, holds that when the act for which the accused is indicted is the same act for which he is convicted, the conviction of the lower degree is proper, although the indictment contains averments constituting the offense of the highest degree of the species of crime and omits to state the particular offense and circumstances characterizing a lower degree of the same crime.  It is a familiar doctrine that upon indictment for murder in the first degree the defendant might in the first instance have been convicted of any lesser grade of homicide, because the less offense is included in the greater; but if upon the trial he is found guilty of manslaughter and that conviction is set aside, he cannot thereafter be convicted of murder in the first degree.  *State v. Martin,* 30 Wis. 216; *State v. Belden,* 33 Wis. 120.  We must hold, therefore, that there is no force in the objections urged against the procedure in this action.

Defendant's counsel strongly insists, with much plausibility, that the trial court erred in excluding letters written by the deceased to the defendant immediately prior to the date of the criminal act and while she was engaged in teaching at Stowell.  This is urged especially upon the ground that the state had offered proof of the effect which defendant's letters, which were not produced, had upon the deceased when received by her, tending to show the existence of trouble between them, while it is claimed that the letters written by her to him show strong affection and good feeling.  Counsel for the state insist that the letters were confidential communications between husband and wife and were therefore not ad-

missible under sec. 4072, Stats. (1898) ; and, furthermore, that the offer of the same did not come within any of the recognized exceptions to the rule excluding privileged communications.   We are not prepared to hold that, upon the trial of the husband for the murder of the wife upon a premeditated design, letters received by him from her immediately prior to the commission of the crime are not admissible as showing the relations existing between the parties and as tending to elucidate the circumstances attending the act. The admissibility might rest upon the necessity of the case as tending to rebut the criminal intent, but we do not consider it necessary to decide the question upon the record as here presented.   We have been referred to no authority directly in point and have been able to find none.   It becomes material, therefore, to consider the circumstances under which the letters were offered and excluded.

The deceased, while engaged in teaching school during the months of April and May, 1903, some distance from her home, wrote her husband several times and received at least two letters from him.   Mrs. Belcher, with whom deceased boarded at the time her school closed, May 29th, as a witness for the state testified that the defendant came for his wife that day, and that she heard them quarreling during the night which preceded the day of her death.   Upon cross-examination, in answer to a question from defendant's counsel, this witness stated that the deceased cried when she got letters from her husband.   Counsel for defendant now insists that this answer was not responsive to the question propounded; but it is to be noted that no motion was made to strike it out.   Upon redirect examination this witness testified, without objection, that the deceased cried when she got a letter from her husband.   "Every letter she got she would come and tell me and she cried."   At such times "she was always downhearted and cried."   There was no motion made by defendant's counsel to strike out this testimony.

It is now urged by defendant's counsel that the jury might have inferred from this testimony that a state of unkindness and ill feeling existed between husband and wife which her letters to him might have had a tendency to overcome. Such letters might have indicated her feelings towards him and also might have had a tendency to show his state of mind towards her, and in that view might have been material if he had been convicted of murder in the first degree; but as the jury has found that the crime was not premeditated, but was committed in the heat of passion, the mental state of the accused at some time prior to the commission of the offense has ceased to be of material consequence, and the rejection of the letters, if properly offered, cannot therefore be deemed prejudicial error. The testimony offered for the purpose stated was of the same nature as evidence of the defendant's good character. The proof would therefore go to the intent of the defendant. The evidence of good character was held not material in such a case. *Hogan v. State,* 36 Wis. 226. In the case cited the defendant was found guilty of murder in the second degree, the killing being perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, without any premeditated design to effect the death of the person killed. It is said in the opinion, discussing the evidence of good character (p. 236):

"The nature and qualities of the act producing death are to be found in the act and circumstances of its commission; and the good or bad character of the accused can have no possible bearing upon them."

Moreover, a perusal of the letters, preserved in the record, shows that they throw no new or different light on the relations of the parties beyond that which the parol evidence disclosed; hence their exclusion was not prejudicial.

The objection to the admission of the letter written by the deceased to the defendant prior to their marriage was properly sustained. It was too remote to have any material bear-

ing upon any of the issues fairly presented for the consideration of the jury on this trial.

The evidence upon the last trial was in all material respects the same as upon the first trial, evidence which this court has held was adequate to support a conviction of manslaughter but not a verdict of murder in the first degree. Nevertheless, with lawyer-like zeal for a client in distress, counsel for defendant insist that the proof is not sufficient to support the verdict of manslaughter in the second degree. The bald fact stands admitted that the deceased, in usual health and spirits, left Warrens for her home in company with her husband, and within an hour thereafter came to her ' death in a most violent and brutal manner. During that fateful period she saw no one and spoke to no one but the accused and his daughter Nina. In the statement of facts the substance of the testimony of these two witnesses is given which in any manner tends to explain defendant's conduct or to exonerate him from criminal responsibility for the death of this unfortunate woman who had a right to look to him for protection. It is also proper to say further, that there is no direct affirmative proof except that of the defendant and his daughter that would tend to acquit him of this awful crime. Two juries by their verdicts have declared, as they might properly, that this testimony is wholly unworthy of belief. Excluding this proof, but one conclusion results, and that is that the defendant, in the heat of passion, caused the death of his wife in a cruel and unusual manner, and was therefore guilty as found by the jury. The direct testimony in support of the verdict has not been referred to, and need not be further than to state that we consider it ample to sustain the verdict. In forbearing to discuss the evidence establishing his guilt we accord to the defendant the charity of silence.

*By the Court.*—Judgment affirmed.

TIMLIN, J. I concur in the affirmance of the judgment of the court below. But, looking to the future, I think it well to spread upon the record a more detailed exposition of the points necessarily decided with reference to the defense of former jeopardy.

The accused was, on his first trial, prosecuted upon an information charging murder in the first degree and found guilty of this crime. On this first trial the court refused to submit to the jury the question whether or not the accused was guilty of manslaughter in the second degree or of manslaughter in the fourth degree, holding that there was no evidence which warranted the submission of either of these two offenses to the jury. This was held to be error and the judgment of conviction reversed. *Montgomery v. State,* 128 Wis. 183, 107 N. W. 14. It was also decided by this court in the Report last mentioned that the evidence did not warrant a verdict of murder in the first degree. The cause was thereupon remanded for a new trial. The accused was then put upon trial on the same information upon which he had been previously tried. He pleaded his former jeopardy in bar of the prosecution, made other motions raising this question, and showed that at the first trial there was withdrawn from the jury by the trial court the offenses of manslaughter in the second and fourth degrees, and he set forth the decision by this court that the evidence was not sufficient to warrant a conviction of murder in the first degree. Demurrers to these pleas were sustained and exceptions taken. The accused was then tried and convicted of manslaughter in the second degree, and the cause comes to this court again. Counsel for the accused now contends: (1) That, the trial court having at the close of the first trial withdrawn from the jury the charges of manslaughter in the first and second degrees, this was an acquittal of these charges, or at least the accused had been in jeopardy thereon. (2) The verdict of

murder in the first degree on the first trial was an express finding of the jury that no homicidal offense involving heat of passion was committed. (3) The decision of the supreme court that the evidence was not sufficient to sustain the verdict acquitted the accused of murder in the first degree.

The sum of counsel's argument, oral and written, on these points is that the jury in the first trial, by finding the defendant guilty of murder in the first degree, acquitted him of all homicidal crime the necessary essentials of which were negatived by that verdict; that the supreme court relieved the accused of that finding, but could not place him in jeopardy again for the said offenses theretofore and after the jury was impaneled and sworn withdrawn from the consideration of the jury by the instructions of the trial court. Compare *Schultz v. State* (opinion filed May 8, 1908) 135 Wis. 644, 653, 657, 116 N. W. 259. The distinctions appear to be that here there was one act charged in the information which by law stood as sufficient to charge seven different offenses, either of which might have been committed by the act charged; there there was one act charged in the indictment as constituting two different offenses. Here there was an instruction to the jury against the objection of the accused to the effect that the evidence was insufficient to support a conviction of two of the seven offenses; there there was an instruction to the jury at the instance of, or at least without objection from, the accused, that the evidence was insufficient to support a conviction of one of the two offenses. It is suggested that there is another ground of distinction in that all homicidal offenses are included in murder, and that not all threats are included in threats to do injury to property; and, as I wish to omit no point of distinction, I mention the suggestion, although it does not seem to me accurate or pertinent. Nevertheless the judgment here is affirmed.

The following opinion was filed June 18, 1908:

Winslow, C. J. (*concurring*). I fully agree with the re-
sult reached in this case, and wish simply to express in my
own way what I conceive to be the grounds of the decision.
The information charged the defendant with murder in the
first degree.   Under long-established and universal rules
this charge included all lesser grades of homicide, and under
it he could be lawfully convicted of any degree of murder or
manslaughter which the evidence sufficiently proved.   *State
v. Martin,* 30 Wis. 216; *Birker v. State,* 118 Wis. 108, 94
N. W. 643; 1 Bishop, New Crim. Law, § 797.   Had he
been acquitted of murder in the first degree, and convicted of
any of the lesser degrees of homicide upon his first trial, he
could not thereafter have been again tried for murder in the
first degree, even had a new trial been granted upon his own
motion, because by such motion he only asked for and ob-
tained a new trial of the charge of which he was convicted,
and hence did not waive his constitutional protection against
a second prosecution for the crime of which he was acquitted.
*State v. Martin, supra.*   But this was not the situation.
The defendant was convicted on the first trial of murder in
the first degree.   When he prosecuted his writ of error from
the judgment upon that conviction and obtained a reversal
and a new trial, the case went back for retrial on the charge
of murder in the first degree, which included all homicides
of a lesser degree just as it did upon his first trial.   He had
by his own act in applying for a new trial waived his consti-
tutional protection against a second trial for murder in the
first degree, and necessarily waived his right to object to a
new trial for any of the lesser degrees included within the
charge of murder in the first degree, as to which charge he
had thus consented that he might be again put in jeop-
ardy.   This is not a case where two separate crimes, neither
of which is included within the other, are charged in the

same information, as was the case of *Schultz v. State,* 135 Wis. 644, 114 N. W. 506, 116 N. W. 259. In that case the court by instructions took from the jury the consideration of one of the separate offenses charged, and a verdict of guilty was rendered, which, under the instructions, this court held must be construed as meaning guilty of the other offense only. A writ of error was prosecuted by the defendant, and it was held to be addressed only to the offense of which he was convicted and not to the one of which he was not convicted, and hence that he had not waived his defense of former jeopardy as to the last-named offense. The distinction between that situation and the present seems to me so manifest as not to call for further elucidation. So it seems to me clear that upon the second trial the defendant might rightly be convicted of any degree of homicide which the evidence sufficiently proved.

As to the letters which were written by the wife to the defendant shortly before the homicide, I regard the question of their admissibility as one involved in much doubt; but, if admissible at all, it was only because they tended to show the state of feeling between the parties. If admissible for this purpose their exclusion was not prejudicial, because it appears upon examination of them that they tended to prove simply the same state of feeling which was abundantly proven by the parol testimony.