Radej v. State, 152 Wis. 503.

---

RADEJ, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 1—February 18, 1913.*

*Criminal law: Homicide: Degrees: Murder in second degree: Elements: Evidence justifying conviction: Guilt in higher degree: Reversal: New trial: Former jeopardy: Harmless errors.*

1. The "premeditated design" of murder in the first degree under our statute is no more nor less than mental purpose to take human life, which may be formed on the instant preceding the

fatal act or at some time prior thereto, it being sufficient that there was a precedent existence of the purpose and persistency of it to and inclusive of the fatal act.

2. Murder in the second degree is included within murder in the first degree, being distinguished therefrom only by the absence of express malice or "premeditated design to effect the death of the person killed or of any human being" necessary to constitute the higher offense.

3. One charged with murder in the first degree but convicted of murder in the second degree may, upon a reversal of such conviction, be tried again for any offense included in murder in the second degree, but cannot again be tried for murder in the first degree.

4. To constitute murder in the second degree all the statutory elements must concur, viz. (1) an act "imminently dangerous to others and (2) evincing a depraved mind, regardless of human life," and (3) absence of any "premeditated design to effect the death of the person killed or of any human being."

5. The pointing of a loaded revolver at another's head and discharging it, satisfies the first requisite, and the doing of this without excuse or justification and not in the heat of passion, satisfies the second.

6. Where the deceased was admittedly of an irritable and quarrelsome disposition and was greatly feared by accused, and the evidence tended to show that when the accused attempted to defend his housekeeper from an attack by the deceased the latter maliciously advanced upon him, threatening to kill, whereupon the accused pointed and discharged a revolver with fatal effect but without any formed intention to kill, a verdict of murder in the second degree was warranted.

7. The beneficent rule of the statute that no error in the proceedings shall disturb the result reached unless it affirmatively appears that, had it not occurred, such result might probably have been more favorable to the party complaining, applies to criminal as well as to civil cases.

8. MARSHALL, J., is of the opinion that under this rule it is not ground for reversal that defendant in a criminal case has been convicted of an offense lower in degree than (but included within) that charged in the information, when the evidence clearly shows guilt in a higher degree.

ERROR to review a judgment of the circuit court for Manitowoc county: MICHAEL KIRWAN, Circuit Judge. *Affirmed.*

Plaintiff in error was, in due form, charged with having May 12, 1912, at Franklin, Manitowoc county, Wisconsin,

murdered John Rolland. He entered a plea of not guilty
and was tried and convicted of murder in the second degree.
Judgment was rendered accordingly.

*A. P. Schenian,* for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *Russell Jackson,* deputy attorney general,
and oral argument by *Mr. Jackson* and *Mr. John J. Healy,*
district attorney.

MARSHALL, J. These facts appear from the evidence without dispute: The accused, a man about fifty years of age at
the time of the homicide, resided on a farm. An old lady, a
relative of his deceased wife, was his housekeeper. John
Rolland, whom the accused had known for several years, resided with him. Rolland was of a somewhat quarrelsome
disposition. Two years before the homicide, without provocation, but from the natural depravity of his nature, he
struck the accused with a pipe wrench in the latter's own
house, who was only saved from serious injury by timely interference of a neighbor who happened to be present. At
times Rolland was agreeable and at others, without any considerable provocation, he was quarrelsome and liable, in case
of being opposed, even by words, to strike any one who might,
for the moment, be the object of his ill will. The accused
was so afraid of Rolland that when the latter was out of temper the former was careful not to do anything to provoke him.
The accused kept a revolver in the house. It customarily
lay, loaded, on a shelf where Rolland could possess himself
of it. He did that on one occasion and discharged all loads
but one. When asked why he kept that, he suggested it
would be handy to use on the accused. On the occasion in
question the two men, the old lady, and one Gallagher were
present at the home of the accused. Gallagher was there to
cut some hay and straw with a machine maintained by the
accused. It was about milking time when the cutting was
finished. The three men all assisted in the work. About

this time the old lady called out as to whether it was not time
to do the milking.    The men were in the barn, reached from
the house by passing over a short space to a pair of bars and
gate at the side, thence into the barnyard and across it.    Upon
the old lady calling about milking, Rolland got very angry
and declared that he would not be bossed around by her.    He
used violent language about and threatened to assault her.
Upon Gallagher and the accused endeavoring to calm him, he
resented and made physical demonstrations toward the latter.
Soon thereafter milking operations were commenced by the
accused and the old lady.    Presently, Gallagher volunteered
to help and the accused handed him the pail and went to the
house for another.    At that time, or on a previous trip to the
house for a milk pail, he placed the revolver in his pocket 'for
use if necessary and to guard against Rolland getting posses-
sion of it.    He returned to the barn without the pail because
he had previously taken it to the stable, as he recalled after
failing to find it at the house.    As he returned, Rolland and
the old lady were standing a little ways apart at the gate in the
barnyard fence.    About the time he was in position to resume
milking operations he heard the old lady, who was still up by
the gate near Rolland, call excitedly to him.    He immedi-
ately responded by advancing within a few feet of Rolland,
drawing the revolver, presenting it to a point directly at Rol-
land's head back of the left ear, raising the weapon to a line
passing through his head, and instantly discharging it.    Rol-
land immediately fell, unconscious, and expired in a moment
or two.    There was some talk, immediately after the shot
was fired, between the accused and Gallagher about going for
a priest, resulting in an understanding that the accused would
do that.    Gallagher then drove away and the accused changed
his mind, hitched up his horse, and drove some distance to
the town clerk to notify him of what had occurred.    He was
there taken in charge by the sheriff without any warrant for
his arrest.

There was evidence tending to prove that, immediately prior to the shooting, Rolland had been near the old lady, interfering with her milking by going around in the vicinity in a menacing manner, using abusive language to her, and finally causing her cow to run away, whereupon he slapped her and followed that with further abusive language; and that when the accused appeared on the scene, in response to her call, Rolland turned to him in a menacing way and threatened to kill him, whereupon the accused drew the revolver, stepped back to the side a little, raised and pointed the weapon, as before stated, and shot Rolland to death.

The accused testified that he took the revolver because he was afraid of Rolland and fearful lest the latter would get it; that he did not intend to shoot the man; that he aimed the weapon at him to scare and keep him back and without any mental determination to discharge it and take human life. The foregoing presents the case in the most favorable light it will fairly bear in favor of the accused. The evidence of Gallagher, as corroborated by the fatal wound, was to the effect that the accused left the place where he was milking, went to the house, immediately returned, passing Rolland and the old lady on the way without indications of excitement, quickly turned back toward the barnyard gate on hearing the old lady call to him, approached Rolland quickly from behind to within a few feet of him, presented the revolver straight at and on a line directly through his head, from a point a little back of the left ear, and immediately discharged it with fatal result, and that, immediately preceding the shooting, no words passed between the two men, and no movement was made by Rolland towards the accused but Rolland's attention was directed toward the old lady. The evidence strongly tended to show that the two men were not particularly unequal in size or ability for physical attack or defense, and that the accused was of such peaceable disposition that Rolland had no reason to be apprehensive, and in fact was

not, of any danger of physical injury at his hands, while Rolland was of an abnormally irritable nature, liable to be controlled by his passions without any more than trifling provocation, and, in such state, to attack and abuse even the rather helpless old lady, and that the accused had pretty good ground to be apprehensive of personal injury at his hands.

The court submitted the cause to the jury upon the theory that there was some reasonable ground in the evidence for a finding of guilt in either of these degrees: murder in the first degree, murder in the second degree, manslaughter in the third degree, or manslaughter in the fourth degree, or to find excusable or justifiable homicide.

It follows from the conviction of murder in the second degree that the jury found the accused not guilty of discharging the weapon with specific mental purpose to take the life of Rolland.    The premeditated design of our statutory murder in the first degree is no more or less than mental purpose to take human life, formable on the instant preceding the fatal act or some time theretofore, it being sufficient that there be a precedent existence of the purpose and persistency of it to and inclusive of such fatal act.

In considering this subject the peculiarity of our statutes, differing somewhat from many others, must not be lost sight of.    The only safe way is to tie closely to the exact characteristic of the offense as the statute has been construed time and again by this court; the vital fact being that, the element satisfying the call for premeditated design, is the mental purpose, the formed intent, to take human life,—the term "premeditated design," in the first and second degrees of murder, and the term "without design to effect death" in murder in the third degree, manslaughter in the first degree, manslaughter in the second degree, and manslaughter in the third degree, being used, synonymously, and for formed intent to kill.  *Hogan v. State,* 36 Wis. 226; *Perugi v. State,* 104 Wis. 230, 80 N. W. 593; *Cupps v. State,* 120 Wis. 504, 97

N. W. 210, 98 N. W. 546; *Montgomery v. State,* 136 Wis. 119, 126, 116 N. W. 876; *Dillon v. State,* 137 Wis. 655, 666, 119 N. W. 352; *Miller v. State,* 106 Wis. 156, 81 N. W. 1020; *Terrill v. State,* 95 Wis. 276, 70 N. W. 356; *Sullivan v. State,* 100 Wis. 283, 290, 75 N. W. 956. We may well say, in passing, that this collection of authorities is made not because there is any doubt about the matter calling for reinforcement of judicial declarations of what the law is by reference to precedents; but, because from experience, it is thought advisable, as to important features of the law to, from time to time, recur to long established and even fundamental principles, and bring the history thereof, as recorded in this court, down to date. Had that been done during the twenty years intervening between *Hogan v. State,* and *Terrill v. State,* followed by *Sullivan v. State,* perhaps the departure in the latter two would not have occurred, rendering it necessary to quickly return to the doctrine so plainly stated and incorporated into our system in the former.

Counsel for plaintiff in error assume that the case is barren of evidence to warrant the conviction of murder in the second degree. True, as counsel contend, conviction of guilt in such degree cannot stand without evidence that the homicide was characterized by all the statutory elements essential to it: (a) an act "imminently dangerous to others;" (b) an act of such character as to "evince a depraved mind regardless of human life;" (c) absence of any "premeditated design to effect the death of the person killed or of any human being," sec. 4339, Stats. 1911; but, it is difficult to perceive any good ground for saying the evidence here does not show all of such elements, if the jury were warranted in finding absence of the "premeditated design." Surely, for a person to point a loaded revolver at a vital part of another's body and discharge it, is to perpetrate an act imminently dangerous to others, and if done without excuse or justification and not in the heat of passion characterizing some lower degree

of homicidal offense than murder in the second degree, evinces "a depraved mind, regardless of human life." Common sense teaches that. One would not think of searching for authority to establish it as a principle or illustrate it by adjudications, and would reject any to the contrary, if found, as unworthy of attention. Therefore we may well pass that feature of the case without further notice.

It must be remembered that murder in the second degree is included within murder in the first degree. The distinction between the two is presence in the latter of express malice, characterized by the call for "premeditated design to effect the death of the person killed or of any human being," and presence, only, in the former of implied malice, from the nature of the slayer's act—absence of the "premeditated design" of the first degree. Given all the elements of the second degree and the "premeditated design" aforesaid, and the offense is raised to the higher degree.

The more important contention of counsel for the accused, is that the jury must have disbelieved the evidence of the accused and grounded their verdict on the evidence of Gallagher to the effect that, the former walked deliberately up to his victim from behind and shot him, and in such circumstances that the offense would be murder in the first degree and nothing else, and, therefore, a conviction of murder in the second degree cannot stand.

As to the effect of Gallagher's evidence, if believed, we need not take issue with counsel; but, that the jury did not base the verdict wholly thereon, is evident, as there was evidence to the contrary—whether believable or not, is another question. We will recur to that later after discussing the effect of setting aside a conviction in such a case as this on the ground urged for it. That will indicate the great care which should be exercised in respect to the matter and the length to which the court has gone in many cases to avoid so administering established rules of law as to work injustice in the name of justice.

Recurring to the effect of the verdict. It stands as a verity, if the decision of the jury had any legitimate basis in the evidence, that the homicide was not characterized by any intent to take human life, else the verdict, logically, would have been murder in the first degree. It also stands as a verity that, the homicide was not characterized by the element of "heat of passion" necessary to reduce it to manslaughter in the third or fourth degree. So the accused has been once put in jeopardy as to every offense of criminal homicide of which, under any circumstances, he could be convicted upon an information charging murder in the first degree. That includes every phase of the case submitted to the jury. However, under the constitutional protection against being twice placed in jeopardy for the same offense, the accused could not, in case of a reversal, be tried again for any offense, except such as are included within the one for which he was convicted,—murder in the second degree or some lower offense of criminal homicide. As to those, the jeopardy was waived by suing out the writ of error and submitting the judgment here for review. As to the higher degree covered by the acquittal, the matter is forever closed. *State v. Martin,* 30 Wis. 216; *State v. Belden,* 33 Wis. 120; *Schultz v. State,* 135 Wis. 644, 655, 114 N. W. 505, 116 N. W. 259, 571.

The court took the stand at quite an early day, that upon a conviction as in this case, the accused must be regarded as having been acquitted of every homicidal offense within the information of a higher degree, and as being within the constitutional protection against successive jeopardies, which he is not presumed to waive as to such higher degree by suing out a writ of error and submitting to the judgment of an appellate court for review his conviction of guilt in the lower degree. That such doctrine might lead, in some cases, to permitting a guilty person to go entirely unpunished, seems plain. Found guilty of murder in the second degree, though the evidence conclusively establishes a homicidal offense in

the higher degree and the judgment reversed upon that ground, he would not be retriable for the higher offense and, if tried for the same one as before, could not, on the same evidence, be efficiently convicted thereof, and the chances would be in his favor, perhaps, as to a homicidal offense of a lower degree, because another jury might not be more likely than the first to find the element of "heat of passion" necessary thereto.    Many courts strongly controvert the rule stated, holding that the effect of it might be so pernicious as to show that the framers of the constitution did not intend the prohibition as to successive jeopardies to be so arbitrary as to prevent waiver of it and to permit one to stand thereon for any purpose and enjoy the right of review and new trial at the same time.

As matter of historical interest, I may say, that the idea incorporated into our constitution upon the subject of successive jeopardies for the same offense, merely crystallized into fundamentals a principle of the common law, but it was not supposed when the matter rested wholly in the common-law principle that a new trial by request preserved for any purpose the former acquittal.    Such being the case it is most natural that, though the provision became, in the beginning, a part of the national and part of every state constitution, the idea which first found significant lodgment here in *State v. Martin, supra,* was either not thought of in the older states, or if thought of, adopted.    It was not borrowed from the fountain of our system, the common law of England.    It has been disapproved by many courts since it originated, including, and significantly, by the declaration of the federal court, speaking by Judge GRIER, in *U. S. v. Harding,* 1 Wall. 127. The early cases here have been many times referred to as among the pioneers, and *State v. Belden, supra,* particularly, as a leading case.    There it was recognized that the question was still open to doubt.    The court deemed itself yet free to take either side of the conflict and chose to stand upon the

doctrine of *State v. Martin;* not because of any supremely dominating rule of written or unwritten law, but because

"It seemed to us, however, more in harmony with the humane maxims of the criminal law and the principles of the constitution, to hold that the finding of the jury acquitting the defendant of the higher offense was an adjudication upon that charge, and that legal effect should be given to it as such, while the new trial should be limited to the lower degree of homicide for which he had been convicted." *State v. Belden,* 33 Wis. 120, 124.

The difficulties of that doctrine have been more and more appreciated by lapse of time, since it was announced. Where it has been thought a constitutional amendment was necessary to remedy it, that has, in many instances, been provided. *Kring v. Missouri,* 107 U. S. 221, 2 Sup. Ct. 443. Where it has been thought legislation, without a constitutional amendment, would remedy the matter, that has occurred. *Comm. v. Arnold,* 83 Ky. 1. In case of the formation of a new constitution in place of an old one the difficulty has not been lost sight of. *Waller v. State,* 104 Ga. 505, 30 S. E. 835. The subject has been given about as much significance by the array of conflicting authorities and annotated cases as any in the criminal law, as will be seen by reference to 12 Cyc. 285, notes 83 and 84; 4 Am. St. Rep. 114 and note; 14 Am. Rep. 748. But, with all, no attempt has been made to change the rule here though it became a part of our system forty years and more ago. During all that time it has been competent for the people, acting by the appropriate lawmaking method, to change it. From the fact that no attempt has been made to do that, the presumption must be that no change is desired by the sovereign power. In any event, the court would deem itself powerless to act in the matter. The responsibility is on the legislature, and this is said without intending to criticise the law as we find it.

The history as I have given it, and the further statement of the law as we find it, is indicative of the judicial vista

through which the facts were viewed in reaching the conclusions in *Frank v. State,* 94 Wis. 211, 68 N. W. 657; *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Flynn v. State,* 97 Wis. 44, 72 N. W. 373; *Sullivan v. State,* 100 Wis. 283, 75 N. W. 956; *Eckert v. State,* 114 Wis. 160, 89 N. W. 826; *Johnson v. State,* 129 Wis. 146, 108 N. W. 55; *Dillon v. State,* 137 Wis. 655, 119 N. W. 352. In each of those cases it was contended that the evidence conclusively showed that, if the accused was guilty at all, he intended to kill his victim and, therefore, was not guilty of murder in the second degree. The thought was, as here, to obtain a reversal and save the benefit of the acquittal of murder in the first degree. While the evidence, commonly, so clearly indicated the design to effect death, essential to murder in the first degree,—in view of the rule that, he who, without efficient justification or excuse, points a loaded gun at a vital part of the body of another, under such circumstances that the natural and probable consequences to be expected by a discharge of it would be the death of the person pointed at, and does so and death ensues, is presumed to have intended that result and is guilty of murder in the first degree,—that it was with great difficulty, if at all, one could discover any justification for the circumstance of the jury having found absence of such intent, yet,—sometimes on one ground and sometimes on another, and, generally, because of the jury having a right, as was supposed, under all the circumstances, shadowy though the matter appeared, to conclude there was some reasonable doubt as to there having been a distinct intent to kill, and that the accused had no right to complain of the jury having taken him at his word, notwithstanding the unreasonableness thereof as to such intent,—the court, facing upon one side the difficulty created by the doctrine that, upon a reversal of a judgment for a homicidal offense of a particular degree on the ground of the evidence conclusively showing guilt of a higher one, no new trial for the latter is permissible, and, upon the other, the

doctrine of *Doherty v. State,* 84 Wis. 152, 53 N. W. 1120, which was, in the judgment of the writer, the main reliance of the defendant in each of such cases, that, regardless of consequences, if one is found guilty of a homicidal offense and the evidence conclusively shows criminality in a higher degree, a reversal must follow,—allowed the conviction to stand.   The rule, in the extreme, has never been re-applied here though often relied on.   Neither has it been overruled. Steering the ship of Justice so as to leave the two doctrines in their integrity and yet avoid any injurious effect of them has not been entirely without difficulty.   In the judgment of the writer, the peril in some cases may be compared to the fabled twin dangers.   To avoid one and not disastrously encounter the other, was a matter of extreme difficulty.   However, that the court has well succeeded in avoiding them is evidenced by the many cases in which they have been encountered and the universality of the escape.   It seems that there was, in general, a very easy and perfectly logical channel to travel to an obviously just result.   That beneficent rule of the statute, that no error in the proceedings shall disturb the result reached unless it affirmatively appears from the whole record that, had it not occurred, such result might probably have been materially more favorable to the party complaining, is applicable to criminal as well as civil cases.   Secs. 2829 and 3072*m,* Stats.; *Hack v. State,* 141 Wis. 346, 124 N. W. 492; *Oborn v. State,* 143 Wis. 249, 279, 126 N. W. 737.

How can an accused person, by any possibility, be injured by a conviction of murder in the second degree when he should have been convicted of murder in the first degree? What right has he to complain when the lower degree was found by reliance, to some extent, on his own testimony? What reason is there for granting a prayer for reversal in such a case, when the petitioner comes confessing, impliedly, that his evidence upon which the jury found him guilty of the lower instead of the higher degree was false?   Does not the

Code, that ever-ready and efficient instrumentality for avoiding the injurious effects of errors that do no harm to the party complaining of them, furnish a ready answer to the claim that error was committed in finding a conviction of murder in the second degree when the evidence shows guilt in a higher degree? Moreover, should not the rule of the Code be regarded as peculiarly applicable where the error complained of was specially beneficial rather than harmful to the party complaining of it? The writer thinks so, and that it would be well to so declare, and yet confesses that it is not necessary to apply such rule now, since the result reached may rest upon the number of precedents to which we have referred, in several of which guilt was shown of the higher degree in face of conviction of homicide in the lower degree more clearly than in this case. The verdicts, in general, in the other cases were justified by the stories of the accused, if given any credence.

It is considered by the court, upon precedent at least, that the jury were warranted here in finding that when the deceased maliciously advanced upon the accused, threatening to kill, the revolver was pointed and discharged without any formed intent to do so with fatal effect, and so, that it is not necessary, even if it would, otherwise, be permissible, to affirm the conviction upon the ground that, if the accused be not guilty of the crime for which he was convicted, it is because he is guilty of murder in the first degree, and his complaint is of a nonprejudicial error,—one which was committed in part reliance upon his own story, and, so, it is the better way to affirm the judgment upon the merits. The court places the affirmance upon that ground and yet permits the writer to here express his inclination to base the affirmance upon the additional ground of want of prejudicial error. Such additional ground mentioned, I think, would follow the logic of *Eckert v. State,* 114 Wis. 160, 89 N. W. 826. The conviction there was of murder in the second degree. The

circumstances quite as strongly as here showed guilt in the higher degree. A reversal on that ground was sought. The accused drew a revolver and deliberately shot his wife twice, once immediately back of the ear; holding the weapon so close to her head as to powder-burn it, and once through the side of her face when she, probably, had her hand so raised, in a spasmodic attempt to protect herself, that the end of her thumb was shot away. Counsel on the appeal contended, as here, for a reversal upon the ground that the evidence and circumstances conclusively showed that the accused deliberately shot his wife, holding the revolver over her while she lay asleep in her bed. The conviction was affirmed, citing *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Flynn v. State,* 97 Wis. 44, 72 N. W. 373; and *Sullivan v. State,* 100 Wis. 283, 75 N. W. 956, the court saying: "Eckert is in no position to object to a verdict based upon the supposed truthfulness of his own testimony as to his being threatened and assaulted by his wife," and under such circumstances that he shot her. So the accused here is in no position to object to the conclusion of the jury that when he shot the deceased he had no thought of taking human life.

*By the Court.*—The judgment is affirmed.