STATE, Respondent, vs. GERMANA, Appellant.

*May 19—June 21, 1938.*

*James D. Sammarco* of Milwaukee, for the appellant.

For the respondent there was a brief by the *Attorney General, Herbert J. Steffes,* district attorney of Milwaukee county, and *Andrew W. Brunhart,* assistant district attorney, and oral argument by *Mr. Brunhart.*

WICKHEM, J. On June 1, 1936, Nunzio Segrata was fatally stabbed. He died the next day. Defendant was arrested and charged with the crime. In order to understand the significance of the assignments of error, the surrounding circumstances must be given in some detail.

Segrata and one John Ponzo lived and boarded with Tony Fera in the upper flat of a two-story frame building in the city of Milwaukee. Defendant, who was seventy-three years of age and unemployed, had been rooming at this flat for about three months prior to the killing. The second floor of the premises consisted of a front bedroom, occupied by Segrata and Ponzo; an adjoining room used as a dining room in which the defendant had his bed; and rear rooms adjoining the dining room consisting of a kitchen and the bedroom of Tony Fera and his wife, Sarah. The second floor could be reached from the ground floor only by means of a front stairway. The first-floor flat was occupied by Charles and Rose Fera, Charles being the son of Tony. A door leads from the front hallway of the lower flat to the stairway. At about 7 o'clock p. m. on the evening of the killing, Tony Fera returned home from fishing. His wife cooked the fish and Segrata, Ponzo, and the Feras ate supper together. Defendant had had his supper and, after eating a little of the fish, left the flat. At 8 o'clock p. m. the Feras left the house for a visit with neighbors.

At that time, according to their testimony, defendant was sitting outside the front door. Thereafter, Ponzo went to bed and fell asleep. At about 9:30 Charles Fera and his wife and children returned home after a visit to Mrs. Fera's mother. While preparing to retire, they heard a peculiar singing noise in the upper flat, but attributed it to Tony Fera, whom they assumed to be drunk. Within a short time thereafter they heard somebody calling, "Charles, Charles," but did not recognize the voice. Charles opened the door into the front hall and discovered Segrata being held up by Ponzo. Ponzo asked, "Who done it?" and Segrata said, "The old man." Charles thought that Segrata was referring to his father, and Rose asked if he meant Tony Fera. Segrata said, "No, no, Tappina." Charles Fera dressed and ran to the corner to telephone for an ambulance. When he came out of the house he saw no one on the street. Ponzo claims to have heard no commotion in the bedroom. He was awakened by Segrata calling to him. The lights were not lit and the house was dark. He put on the lights, rushed down stairs and found Segrata standing at the bottom of the stairs. He was bleeding. The police later discovered a trail of blood beginning with the edge of the carpet in the dining room and continuing to the bottom of the staircase. Sometime after 10 o'clock, Tony and Sarah Fera returned from their visit, and at that time defendant had not come home. Segrata was taken to the emergency hospital and found to be suffering from an abdominal wound three inches deep. The large bowel and the mesentery were lacerated. Later in the evening defendant returned to the flat and was arrested. He claimed then and upon the trial that he had been away from the house all evening. The police found in his possession an open pocket knife with a blade capable of inflicting a wound such as that sustained by deceased. The knife had been thoroughly cleaned, and there were no blood stains

upon it or any of the pocket dust that usually accumulates upon a knife so carried. One George Kollura, living four houses north of the scene of the murder, claims to have seen defendant at about 9:30 walking northward in front of his house. Before his death Segrata, who spoke practically no English, made a dying declaration through an interpreter to the effect that he had been stabbed by defendant.

The first assignment of error is that the court erred in permitting an incompetent interpreter to testify as to the translation of the reported dying declaration. The claim is that Segrata was a native of Mercine in Sicily, and spoke the dialect of that place; and that Officer Gentilli, who took the dying declaration, was an American of Italian descent who spoke the Messinese dialect, had no experience as interpreter, and no knowledge of Italian except what he had picked up while living in the Italian district and speaking such portions of the Italian language as are embraced in an ordinary Sicilian dialect. It is contended that the cross-examination indicates that there are many words in the Messinese dialect that he was unable to translate, and that he had substituted words of his own in making the purported declaration. We have carefully examined the testimony of Officer Gentilli and particularly his cross-examination. He was exhaustively cross-examined as to his knowledge of Italian. He was the son of Sicilian parents and had talked at home and in the neighborhood the dialect current in a neighborhood largely populated by Sicilians. He showed some weakness in grammar and spelling and an inability to translate into Italian such words as "plaintiff," "defendant," "hereby," "district attorney," and other legal words not in common use. However, the court and jury were entitled to conclude that he had a sufficient knowledge of colloquial Italian and of Sicilian dialects to carry on an ordinary conversation with Segrata, and to elicit from him

the very simple statement that he was stabbed by defendant. There is no showing that the Italian words used by Gentilli could have caused any misunderstanding by Segrata as to the import of the questions, or that any of the words used by Segrata could have been misunderstood by the interpreter. The declaration was made with the understanding on the part of Segrata that he was dying, and it related to the circumstances of his homicide. It was simple and uncomplicated, and the competency of the officer to take it was sufficiently established.

The next assignment of error is that the court should not have admitted the dying declaration for the reason that Segrata lacked testimonial qualifications. This is based on the fact that the entire house was dark, and that there is no evidence that Segrata could have recognized defendant by the use of any of his senses. From this it is argued that Segrata testified to a conclusion not based upon sensory impressions received at the time of the assault. The contention is without merit. The fact that the house was dark when Ponzo was aroused by the calls of Segrata for help does not demonstrate that the latter could not have recognized his assailant by the use of his senses. The circumstances which would make recognition possible are too numerous to detail. On two separate occasions Segrata stated positively he had been stabbed by the defendant, and there is nothing in the record to require the conclusion that he had not the testimonial qualifications necessary to make the statement or that it was merely a conjecture or guess.

The next assignment of error is that the court should have directed a verdict because the evidence fails as a matter of law to establish defendant's guilt beyond a reasonable doubt. The following circumstances require that this contention be rejected: On two distinct occasions Segrata positively stated that defendant was his assailant. The evidence of a neighbor puts defendant in the vicinity of the murder within a very

short time after it was committed. Defendant had upon him when arrested an open pocket knife capable of producing the wound, and which had evidently been carefully, thoroughly, and recently cleaned. The latter is a significant circumstance, and the jury was entitled to give it a great deal of weight. Defendant testified that he used the knife to clean his nails, but there is evidence that his nails showed no evidence of having been recently cleaned. While the evidence of motive is not strong, there is testimony to the effect that defendant and Segrata quarreled about a month before the killing.

Defendant's alibi is quite hazy and indefinite. He claims that he left the house about 8 o'clock and proceeded to a small garden plot about three blocks from the place of the murder and picked some dandelions and other greens which he cleaned with his pocket knife and ate. He claims he stayed in this garden plot for about an hour and a half. He says that he then went to Nick Fucarino's tavern where he had a glass of beer. He fixed the time at which he arrived at the tavern as between 9 and 9:30, but was not certain as to the precise time, and could not say that it was not as late as 10 o'clock. The tavern keeper testified that defendant came to the tavern at 10 o'clock, and that he remembers this because defendant inquired as to the time. Upon leaving this tavern, defendant went to another tavern and there is testimony that he arrived there about 10:30. The alibi is wholly ineffective. The jury was entitled to conclude that defendant did not come to Fucarino's tavern until Segrata was already in the hospital, and that he could easily reach the tavern after the affray. In view of the foregoing, defendant's contention cannot be sustained. That there were circumstances that might properly be argued to the jury as affecting the weight of the evidence or the strength of the inferences to be drawn therefrom is, of course, quite immaterial upon this appeal.

Defendant's final contention is that the court erred in submitting second-degree murder to the jury; that defendant

was either innocent or else guilty of first-degree murder; and that there is no evidence whatever to justify a conviction for second-degree murder. The authorities are to the effect that, where the evidence would sustain a conviction for murder in the first degree, provided the jury were satisfied beyond all reasonable doubt that the shooting was with premeditated design to effect death, it was open to the jury, if they did entertain such doubt, to give defendant the benefit of the doubt and acquit him of first-degree murder; but that defendant may not complain and secure a reversal of the conviction because the jury have given him the benefit of the doubt and found him guilty of second-degree murder. *Walsh v. State,* 195 Wis. 540, 218 N. W. 714; *Radej v. State,* 152 Wis. 503, 140 N. W. 21.

The *Radej Case* thoroughly discusses the matter under consideration, and it will not be necessary to repeat what was said in that case. If it is true that defendant is not prejudiced by a verdict of second-degree murder when the evidence would have sustained a verdict of first-degree murder, it is with like reason true that the submission of a verdict of second degree by the court was not prejudicial.

The case of *Pliemling v. State,* 46 Wis. 516, 1 N. W. 278, cited by defendant, is clearly distinguishable. In the *Pliemling Case* defendant was prosecuted upon an information for murder in the first degree with five counts. The first count charged the murder of one Laura Van Voorhees; the second that of Edward, her son; the third, that of Stella, her daughter; the fourth, that of Claudia, her infant daughter; and the fifth the murder of all four together. The facts were that on November 1, 1877, the house in which the Van Voorhees family lived burned and the remains of the mother and the three children were found. The testimony established that each had been killed by a blow from a blunt instrument. Defendant was accused of the crime and convicted of murder in the third degree. Murder in the third

degree is defined in the statutes as the killing of a human being without design to effect death by a person engaged in the commission of any felony. It was sought to support this degree of murder by evidence, held to be wholly insufficient, that the crime was committed by defendant while engaged in the commission of rape upon, or adultery with, the mother. The court found that (p. 523) :

". . . Although the verdict is for an offense included in and less than murder in the first degree, for which the defendant might have been convicted under the information upon sufficient evidence, if unsustained by the evidence and by facts necessary to constitute the offense of murder in the third degree of which he was convicted, the verdict is erroneous, and the judgment must for that reason alone be reversed." Citing *State v. Hammond,* 35 Wis. 315; *State v. Erickson,* 45 Wis. 86.

The court stated that :

". . . If the jury were satisfied beyond a reasonable doubt, as they should have been in order to convict him at all, that the defendant was guilty of this horrible deed, then it is quite evident that the verdict was a compromise, of the most unjustifiable if not reprehensible character; and if they were not so satisfied, then the verdict was a wrong and a crime."

The difference between this case and the case at bar arises out of the wide difference between murder in the first degree and murder in the third degree. A jury may, as held by the *Radej* and *Walsh Cases, supra,* convict of second-degree murder if it is not satisfied beyond a reasonable doubt that there was a premeditated design to effect death. It is quite another thing when a jury, without the slightest evidence to support it and in a case where defendant denies having committed the homicide, brings in a verdict of third-degree murder. Such a verdict under the circumstances, in view of the wide difference between first and third-degree murder, suggests not doubt as to the existence of a premeditated design but doubt or difference of opinion in the juryroom whether

defendant committed the homicide at all. In such a case the court is compelled strongly to suspect, as stated in the *Pliemling Case,* that the jury have either arbitrarily reduced the degree in spite of a finding of premeditated intent to kill or, what is more prejudicial from the standpoint of defendant, resolved a reasonable doubt whether he committed the homicide by finding him guilty of a lesser degree of murder when they should have acquitted him. The case is quite different where a jury may be supposed to have entertained some doubt as to the existence of premeditated design and have therefore found a verdict of second-degree murder. As is said in *Lasecki v. State,* 190 Wis. 274, 278, 208 N. W. 868:

"Doubtless defendant would not have taken this position had he not known that he could play his game with loaded dice under the rule adopted in *State v. Martin,* 30 Wis. 216. His purpose is to obtain a reversal and at the same time to save the benefit of the acquittal of murder in the first degree. If defendant must be acquitted of all lesser degrees of homicide because guilty of murder in the first degree, then, although he is guilty of an offense which should be punished by imprisonment for life, the defendant must be given his freedom without undergoing punishment. If the court must administer the rules of law so as to work such an injustice in the name of justice, it presents good reason for changing the rule as to former jeopardy when the defendant asks and is granted a new trial. Fortunately no such miscarriage of justice need result in the application of the well-established rules of law in this case."

A careful examination of the record satisfies us that the evidence sustains the verdict; that defendant had a fair trial; that he was adequately and ably defended; and that the conviction must stand.

*By the Court.*—Judgment affirmed.